**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 28 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

FONIX, a Delaware corporation,

Plaintiff - Appellee,

v.

JOHN R. CLARKE and PERPETUAL
GROWTH FUNDS ADVISORS, INC.,

Defendants - Appellants.

No. 01-4051

(D. Utah)

(D.C. No. 2:98-CV-801-K)

**ORDER AND JUDGMENT** *

Before **LUCERO** , **McKAY** , and **MURPHY** , Circuit Judges.

## I. INTRODUCTION

Appellants John Clarke and Perpetual Growth Funds Advisors, Inc.

("Perpetual Growth") appeal the district court's judgment in favor of appellee,

Fonix Corporation ("Fonix"). The district court determined that the agreement

between the parties did not require Fonix to pay appellants "trailing fees." We

have jurisdiction under 28 U.S.C. § 1291 and **affirm** .

---

*This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

## II. FACTS

Fonix designs and markets speech-recognition software. In the 1990s, Fonix had not been able to generate enough revenue through marketing of its software to pay operating expenses. To cover its costs, Fonix relied on the infusion of venture capital. Appellants help fledgling technology companies like Fonix locate investors.

In February 1998, an employee of Perpetual Growth contacted Roger Dudley, Fonix's Chief Financial Officer, to determine if Fonix was interested in locating investors. Dudley indicated Fonix was. The principal of Perpetual Growth, Clarke, contacted Dudley on February 25. Dudley and Clarke had a telephone conversation about Fonix's business and need for venture capital. They agreed that Clarke would begin to locate potential investors. At Clarke's behest, Dudley signed a written agreement to pay a commission to Clarke and Perpetual Growth for an investment in Fonix made by an investor located by Clarke. There is a dispute in the evidence whether Clarke and Dudley discussed the payment of a "trailing fee," a commission on any future investment made by an investor located by Clarke, or whether they limited the commission to that which was owed on the first investment.

After the conversation, Clarke personally typed the agreement and faxed it to Dudley. Dudley signed it and faxed it back. The agreement stated

Thank you for the recent conversation. We believe that we can successfully introduce Fonix Corp to an investor that will complete an investment not only meeting the terms, but the timing needs of Fonix as well. As with anything, money is a motivator and we believe motivation is the key to swift results.

We would like to agree to an introduction fee of 5% paid at closing of a financing between Fonix Corp and an investor that is a result of an introduction by Perpetual Growth Advisors, Inc.

We realize that this is a non-exclusive agreement and will only occur if the terms and conditions of the investment, and investor are accepted by Fonix Corp.

The district court determined that this February 25 written agreement was the only contract between the parties. Appellants do not contest this determination.

Soon after the contract was signed, Clarke located Stephen Hicks, president of Southridge Capital Management, L.L.C. and an advisor to several investment funds. Clarke set up several calls between Fonix and Hicks, which culminated in a financing agreement between Fonix and five investment funds ("the Funds"), two of which were directly advised by Hicks. That agreement specified that the Funds would purchase $10 million of Fonix stock. The agreement further provided that after sixty days the Funds would purchase an additional $10 million of Fonix stock if certain conditions relating to the value of the stock were met. These conditions were not met, and Fonix never received the second tranche of $10 million. Shortly after this agreement was finalized, Fonix, through Dudley, informed Clarke of the agreement. Clarke instructed Dudley to wire the five

percent finder's fee on the $10 million investment, $500,000, to two separate bank accounts. At the end of the fax relating these instructions, Clarke wrote, "This wire will indicate there are no outstanding obligations between Fonix Corporation and Perpetual Growth Adivsors." Clarke received the $500,000 several days later.

In the months following the March 9 $10 million investment, Fonix entered into several agreements with other investors resulting in an additional $56 million of investments in Fonix. Appellants contend that all of these transactions came about through the introduction of Hicks to Fonix. Trailing fees were never paid to Appellants on any of these subsequent transactions.

Fonix brought this diversity action in federal district court in Utah. It sought a declaratory judgment that it had no duty under the February 25 fee agreement to pay a five percent fee on the transactions subsequent to the initial $10 million investment in March. Appellants counterclaimed for fees on these transactions. The district court held a two-day bench trial. At the conclusion of the trial, the court concluded that under Utah law the agreement was ambiguous. The district court determined that the extrinsic evidence offered by both sides conflicted and failed to clarify the agreement. It therefore resolved the ambiguities against the drafter, Appellants, and determined that the parties

-4-

intended that Appellants would receive a five percent fee only on a single transaction following introduction of Fonix to an investor.

## III. DISCUSSION

### A. Standard of Review and Applicable Law

We review the district court's factual findings for clear error and its legal conclusions *de novo* . *See Keys Youth Servs., Inc. v. City of Olathe*, 248 F.3d 1267, 1274 (10th Cir. 2001). Both parties agree that Utah law applies. *See Webco Indus., Inc. v. Thermatool Corp.* , 278 F.3d 1120, 1126 (10th Cir. 2002) (applying Michigan law after parties agreed to its applicability). Under Utah law, whether a contract is ambiguous is a legal question. *See Winegar v. Froerer Corp.* , 813 P.2d 104, 108 (Utah 1991). If the contract is ambiguous, the question of the parties' intent, determined by examination of extrinsic evidence, is a factual question. *See Peterson v. Sunrider Corp.* , 48 P.3d 918, 924 (Utah 2002). Thus, if we agree with the district court that the February 25 finder's fee agreement is ambiguous, we review for clear error its finding that the extrinsic evidence failed either to prove or disprove an intent to provide for trailing fees.

### B. Ambiguity

Both parties agree that we should first examine the text of the agreement to determine ambiguity. *See Cent. Fla. Invs., Inc. v. Parkwest Assocs.* , 40 P.3d 599, 605 (Utah 2002). As Fonix points out, much of the agreement is phrased in the

singular. The first paragraph states "[w]e believe that we can successfully introduce Fonix Corp to *an investor* that will complete *an investment*." (emphasis added). The second paragraph sets a five percent introduction fee paid at "closing of *a financing* between Fonix Corp and *an* investor." (emphasis added). The third paragraph provides, "[w]e realize that this is a non-exclusive agreement and will only occur if the terms and conditions of *the investment, and investor* are accepted by Fonix Corp." (emphasis added). The wording indicates that the parties contemplated a single investor and a single investment.

Appellants point to some of the same language in the second paragraph, contending that "[w]e would like to agree to an introduction fee of 5% paid at closing of a financing" is open-ended. Appellants argue that the phrase does not specify a particular financing but indicates the parties intended to obligate Fonix to pay appellants five percent at the closing of *any* financing resulting from an introduction made by Clarke.

Both readings are plausible. Consequently, we agree with the district court that the agreement is ambiguous. *See Dixon v. Pro Image, Inc.*, 987 P.2d 48, 52 (Utah 1999) (language is ambiguous if it "is reasonably capable of being understood in more than one sense" (quotation omitted)).

## C. The Parties' Intent

According to Utah law, if an agreement is ambiguous it is appropriate to consider extrinsic evidence to discern the parties' intent. *See Interwest Constr. v. Palmer*, 923 P.2d 1350, 1359 (Utah 1996). In this case, Fonix offered substantial evidence that the parties intended that a finder's fee would be owed only on a single transaction. Fonix's CFO, Dudley, testified that Fonix did not intend to pay trailing fees and that he and Clarke never discussed trailing fees. Fonix also presented several agreements Fonix entered into with other finders. In all of those agreements, there is an explicit trailing fees provision. Finally, Fonix offered the testimony of Robert Miller, an individual with extensive experience in the investment field as an investor, advisor, and finder. He testified that trailing fees were rare in the industry and that the industry practice was to include a trailing fees provision in the finder's agreement if they were to be paid.[1]

Appellants offered the testimony of Clarke. Clarke testified that he and Dudley did discuss trailing fees and that Clarke had told Dudley that he was interested in locating an investor for Fonix who would provide multiple infusions

---

[1] Appellants argue that Miller's testimony should have been excluded as unreliable under *Daubert v. Merril Dow Pharm., Inc.*, 509 U.S. 579 (1993). They contend that Miller advised a fund that had invested in Fonix in the past and was thus biased. Appellants do not appear to have argued below that Miller's possible bias makes his testimony inherently unreliable and thus inadmissible under *Daubert*. We will thus not consider the argument.

of capital. Clarke admitted that the agreement could have been clearer and would have been if his secretary had typed up the agreement as she usually does.

Appellants also offered the testimony of Alan Zazoff, the managing director of an investment banking firm. Zazoff testified that he had acted as a finder many times. He testified that the standard industry practice is to pay trailing fees and that when a finder's agreement is silent, such fees are still generally paid. On cross-examination, however, he testified that he rarely worked directly with a company needing investment. Instead, another finder working with the company generally contacted him to locate investors. As such, he rarely had written agreements directly with the company, as Clarke did with Fonix. Zazoff conceded that whether that finder, and thus himself, would be paid trailing fees depended upon the specific contract between the finder and the company.

Appellants also presented the testimony of David Cace, a certified public accountant. The majority of Cace's testimony dealt with his review of Fonix's SEC filings. Cace reviewed the filings and determined which Fonix investors involved Stephen Hicks. The only testimony relevant to whether the agreement obligated Fonix to pay trailing fees was his discussion of a footnote to Fonix's 1998 10-K. He testified that footnote ten stated that Fonix had incurred finder's fees of $163,846 on a $3 million dollar investment made in June and August

1998, a few months after the $10 million dollar investment on which Fonix paid Clarke finder's fees. Hicks acted as an agent in the June/August transaction.

After viewing the record in the light most favorable to the district court's decision, we are unable to conclude that the district court clearly erred in finding that the extrinsic evidence conflicted and failed to clarify the parties' intentions. *See Sanpete Water Conservancy Dist. v. Carbon Water Conservancy Dist.*, 226 F.3d 1170, 1178 (10th Cir. 2000) ("On appeal, we view the evidence in the light most favorable to the district court's ruling."). There was considerable disagreement between Zazoff and Miller, the two experts. Zazoff testified the standard of the industry was to pay trailing fees. Miller disagreed, testifying trailing fees were rare. The district court ultimately believed Miller's testimony, however, that the standard industry practice was to include a trailing fees provision in a contract if they were to be paid. The district court also had before it evidence that Fonix regularly included trailing fees provisions in finder's agreements when they were to be paid. Finally, the district court considered Dudley's testimony that he and Clarke never discussed trailing fees and that he never considered paying such fees. On the other hand, the footnote to the 1998 10-K tends to indicate Fonix did recognize a duty to pay trailing fees. Moreover, Clarke testified that he and Dudley did in fact discuss the payment of trailing fees.

In view of this conflicting evidence, the district court's finding that the extrinsic evidence failed to clarify the terms of the agreement does not leave us with a "definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quotation omitted). The district court had three options. It could have found the extrinsic evidence supported Fonix's version of the agreement, appellants' version, or neither version. Any of these options were permissible based on the evidence, and therefore the district court's decision was not clearly wrong. *See id.* at 574.

## IV. CONCLUSION

Having appropriately concluded that the extrinsic evidence failed to clarify the terms of the agreement, the district court properly interpreted the agreement against the drafter, Appellants. *See Wilburn v. Interstate Elec.*, 748 P.2d 582, 585-86 (Utah Ct. App. 1988). We therefore **AFFIRM** the judgment of the district court.

Entered for the Court

Michael R. Murphy
Circuit Judge

-10-